**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | |
|---|---|
| 4431, INC.,4431 ASSOC., LP, 3354 WALBERT ASSOC., LP, 3354 WALBERT AVENUE ASSOCIATES, LLC, BLUE GRILLE HOUSE AND WINE BAR, 4131 ASSOCIATES, CANDLELIGHT INN, 2960 CENTER VALLEY PARKWAY, LLC, 3739 WEST CHESTER PIKE, LLC, MELT RESTAURANT GROUP, LLC, PAXOS RESTAURANTS, INC., MELT REAL ESTATE GROUP, LP., and TOP CUT STEAKHOUSE, : : : : : : : : : : | |
| Plaintiffs, : : | No. 5:20-cv-04396 |
| v. : : | |
| CINCINNATI INSURANCE COMPANIES, THE CINCINNATI INSURANCE COMPANY, THE CINCINNATI CASUALTY COMPANY, and THE CINCINNATI INDEMNITY COMPANY, : : : : : : | |
| Defendants. : | |

_____

## **O P I N I O N**

**Defendants' Motion to Dismiss for Failure to State a Claim, ECF No. 5—GRANTED**

**Joseph F. Leeson, Jr.**                                    **December 3, 2020**
**United States District Judge**

## I.      INTRODUCTION

This insurance coverage dispute stems from the ongoing COVID-19 pandemic and its

impact on the ability of several restaurants to operate.  Plaintiffs are twelve commercial entities

that own and operate restaurants in Pennsylvania (collectively, "Plaintiffs").  They purchased

four identical "All Risk" property insurance policies ("the Policies") from Defendants Cincinnati

Insurance Company and related entities (collectively, "Cincinnati").  As with so many other

businesses, Plaintiffs have been forced to limit their operations as a result of the COVID-19

pandemic, closing their restaurants for in-dining and bar service.  After Cincinnati refused to pay Plaintiffs' claims for pandemic-related loss of income under the Policies, Plaintiffs commenced this action in the Court of Common Pleas of Northampton County.  Cincinnati removed the action to this Court on diversity grounds and now moves to dismiss the Complaint for failure to state a claim, arguing Plaintiffs' losses are not covered by the terms of the Policies.  Plaintiffs oppose the motion.

Upon consideration of Cincinnati's motion to dismiss and Plaintiffs' opposition thereto, and for the reasons set forth below, the motion is granted, and Plaintiffs' Complaint is dismissed.

## II.    BACKGROUND

### A.    Facts Alleged in Plaintiffs' Complaint[1]

Plaintiffs operated bar and dine-in services on the premises of and as part of several restaurants in Pennsylvania.  Plaintiffs' Complaint ("Compl."), ECF No. 1, ¶¶ 2, 22.  Due to Orders issued by the Governor of Pennsylvania in response to the COVID-19 pandemic, Plaintiffs were forced to close on-premises dining and bar service at their restaurants beginning on March 19, 2020, and continuing to the present.  *Id*. ¶¶ 3, 27-31.  Their restaurants remain open only for takeout service.  *Id*. ¶ 32.  These closures have resulted in losses in excess of $100,000.00 per month since March 19, 2020, for each of Plaintiffs' restaurants.  *Id*.

---

[1]    These allegations are accepted as true, with all reasonable inferences drawn in Plaintiffs' favor.  *See Lundy v. Monroe Cty. Dist. Attorney's Office*, No. 3:17-CV-2255, 2017 WL 9362911, at *1 (M.D. Pa. Dec. 11, 2017), *report and recommendation adopted*, 2018 WL 2219033 (M.D. Pa. May 15, 2018).  Neither conclusory assertions nor legal contentions need be considered by the Court in determining the viability of Plaintiffs' claims.  *See Brown v. Kaiser Found. Health Plan of Mid-Atl. States, Inc.*, No. 1:19-CV-1190, 2019 WL 7281928, at *2 (M.D. Pa. Dec. 27, 2019).  Much of the Complaint is legal argument regarding construction of insurance policies and Plaintiffs' Policies in particular.  The majority of these legal assertions are not included in the Court's recital here, except where necessary for context and continuity.

Prior to March 2020, Plaintiffs purchased four "All Risk" insurance policies from Cincinnati.[2]  *See* Compl. ¶ 4.  The terms of the Policies are identical.  *Id*. ¶ 14.  The Policies provide as follows:

> We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration".  The "suspension" must be caused by direct "loss" to property at a "premises" caused by or resulting from any Covered Cause of Loss.

Policy at 47.  The Policies further state:

> We will pay for the actual loss of "Business Income" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration".  The "suspension" must be caused by direct "loss" to property at "premises" which are described in the Declarations and for which a "Business Income" Limit of Insurance is shown in the Declarations.  The "loss" must be caused by or result from a Covered Cause of Loss.

*Id*. at 102.  And further:

> We will pay Extra Expense you sustain during the "period of restoration".  Extra Expense means necessary expenses you sustain . . . during the "period of restoration" that you would not have sustained if there had been no direct "loss" to property caused by or resulting from a Covered Cause of Loss.

---

[22]     Although a copy of the Policies may have been attached to the original Complaint when filed in state court, there are no copies attached to the Complaint as filed with Cincinnati's Notice of Removal.  The Policies are however attached in full as exhibits to Cincinnati's motion papers.  Policy No. EPP 017 41 30 was issued to the Blue Grillhouse Plaintiffs for the policy period October 1, 2019 to October 1, 2022; Policy No. ECP 028 55 02 was issued to the Torre Restaurant Plaintiff for the policy period October 1, 2019 to October 1, 2022; Policy No. EPP 040 99 71 was issued to the Firepoint Grille Plaintiff for the policy period October 1, 2019 to October 1, 2020; and Policy No. EPP 017 41 28 was issued to the Melt Restaurant Plaintiffs for the policy period October 1, 2019 to October 1, 2020.  *See* Cincinnati's Memorandum in Support of their Motion to Dismiss ("Defs.' Mem."), ECF No. 5, Exhibits A-D.  The Court directly references the language of the Policies rather than the Complaint where doing so enhances clarity.  Where the Court directly references the language of the Policies, the Court's citation is to the Policy attached as Exhibit A to Cincinnati's Memorandum in Support of its Motion, ECF No. 5-5.  The Court cites to the Bates numbers applied by Cincinnati to the bottom of each page of the document.

*Id*. at 48.  The Policies also provide that Cincinnati "will pay for direct 'loss' to Covered

Property at the 'premises' caused by or resulting from any Covered Cause of Loss."  *Id*. at 32.

 Relevant to Plaintiffs' suit, the Policies also contain a provision regarding covered losses

stemming from actions of "civil authority":

> When a Covered Cause of Loss causes damage to property other than Covered
> Property at a "premises", we will pay for the actual loss of "Business Income" and
> necessary Extra Expense you sustain caused by action of civil authority that
> prohibits access to the "premises", provided that both of the following apply:
>
> > (a) Access to the area immediately surrounding the damaged property is
> > prohibited by civil authority as a result of the damage; and
> >
> > (b) The action of civil authority is taken in response to dangerous physical
> > conditions resulting from the damage or continuation of the Covered Cause
> > of Loss that caused the damage, or the action is taken to enable a civil
> > authority to have unimpeded access to the damaged property.

Policy at 48.

 The Policies define "Covered Causes of Loss" as used in the above provisions as "direct

'loss' unless the 'loss' is excluded or limited in this coverage part."  Compl. ¶ 16.  "Loss" is in

turn defined as "[a]ccidental physical loss or accidental physical damage."  *Id*; *see, e.g*., Policy at

67.  There are no exclusions or limitations for viruses under the Policies.  *See* Compl. ¶¶ 17, 41-

42.

 The Policies were fully paid and in effect as of March 2020, and have remained fully paid

and in effect at all times since March 2020.  Compl. ¶¶ 23-24.  At some point during or after

March 2020, Plaintiffs submitted claims for loss of income under the Policies.  *Id*. ¶ 34.

Plaintiffs state that their loss of income is the result of mandatory physical closures due to the

spread of COVID-19, and is covered under the terms of the Policies.  *Id*. ¶ 45.  Specifically,

Plaintiffs claim the closures were the result of "a covered cause of loss which inflicted a direct

physical loss and/or caused direct physical damage to their covered premises.  Plaintiffs also

have had to pay for disinfecting and cleaning the premises to prevent COVID-19 contamination." *Id*.  Plaintiffs also state that they are entitled to "Civil Authority Coverage" under the Policies as a result of what they identify as Pennsylvania's "Civil Authority Orders"—*i.e.*, mandatory closure and stay at home orders issued by the Governor of  Pennsylvania.[3]  *Id*. ¶¶ 57-62. Cincinnati denied all of Plaintiffs' claims for lost business income.  *Id*. ¶ 35.

Based upon the above averments, Plaintiffs assert a claim for declaratory judgment under 42 PA. CONS. STAT. § 7532,[4] *see* Compl. ¶¶ 36-63, as well as a claim for breach of contract, *see id*. ¶¶ 64-69.

### B.     Procedural Background

On July 24, 2020, Plaintiffs commenced this action in the Court of Common Pleas of Northampton County.  *See* ECF No. 1.  Cincinnati filed a Notice of Removal on September 8, 2020, removing the case to this Court on the basis of diversity jurisdiction.  *See id.*  Shortly thereafter on September 15, 2020, Cincinnati filed the instant motion to dismiss the Complaint for failure to state a claim.  *See* ECF No. 5.  On September 23, 2020, Plaintiffs filed a motion to remand the action back to state court.  *See* ECF No. 6.  On October 14, 2020, after receiving correspondence from the parties indicating Plaintiffs' wish to withdraw their motion to remand, the Court granted that request and extended the deadline for Plaintiffs' response to the pending motion to dismiss.  *See* ECF No. 10.  Plaintiffs' opposition to the motion to dismiss was filed on October 26, 2020, *see* ECF No. 11, and Cincinnati's reply in further support of its motion was filed on November 3, 2020, *see* ECF No. 13.

---

[3]     Plaintiffs additionally state that the Policies' "Pollutants Exclusion" does not apply to a virus.  *See* Compl. ¶ 63.

[4]     Notwithstanding its label as the Complaint's "First Cause of Action," "[d]eclaratory judgment is a form of relief, not an independent legal claim."  *Jones v. ABN AMRO Mortg. Grp., Inc.*, 551 F. Supp. 2d 400, 406 (E.D. Pa. 2008), *aff'd*, 606 F.3d 119 (3d Cir. 2010).

III.    **DISCUSSION**

A.    **Whether Exercising Jurisdiction is Appropriate**

1.    *Applicable Legal Principles*

Although Plaintiffs' motion to remand has technically been withdrawn, the question of whether this Court should exercise jurisdiction over the action and rule on Cincinnati's motion to dismiss is still one that the Court must address.  This is due to the declaratory relief Plaintiffs seek.  *See Rarick v. Federated Serv. Ins. Co.*, 852 F.3d 223, 227 (3d Cir. 2017) ("When an action seeks legal relief, federal courts have a virtually unflagging obligation to exercise jurisdiction. . . . When an action seeks declaratory relief, however, federal courts may decline jurisdiction under the [federal] Declaratory Judgment Act.") (internal quotation marks omitted).

The federal Declaratory Judgment Act ("DJA")[5] provides in relevant part as follows:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a) (emphasis added).[6]  "[T]he DJA grants discretion to federal district courts, who have 'no compulsion' to exercise their jurisdiction over cases seeking declaratory

---

[5]    At the outset, the Court observes that its authority to issue declaratory relief stems from the federal Declaratory Judgment Act, 28 U.S.C. § 2201, rather than from Pennsylvania's declaratory judgment statute, 42 PA. CONS. STAT. § 7532.  This is because "[o]nly the courts of the Commonwealth [of Pennsylvania] have 'the power to grant declarations and injunctive relief pursuant to [Pennsylvania's] Declaratory Judgments Act.'"  *Keystone ReLeaf LLC v. PA Dep't of Health*, 186 A.3d 505, 517 (Pa. Commw. Ct. 2018) (quoting *Empire Sanitary Landfill, Inc. v. Com., Dep't of Envtl. Res.*, 546 Pa. 315, 332 (1996)); *see SWB Yankees, LLC v. CNA Fin. Corp.*, No. 3:20-CV-01303, 2020 WL 5848375, at *2 (M.D. Pa. Oct. 1, 2020) ("[A] Pennsylvania state court in a declaratory action may 'declare rights, status, and other legal relations whether or not further relief is or could be claimed.'" (quoting 42 Pa. Cons. Stat. § 7532)).

[6]    "Although courts often refer to a court's 'jurisdiction' under the DJA, the statute is not a jurisdictional grant. Rather, the Supreme Court has characterized the DJA as procedural, affording a remedial option in a case over which a court must have an independent basis for

judgment." *Greg Prosmushkin, P.C. v. Hanover Ins. Grp.*, No. CV 20-2561, 2020 WL 4735498, at *2 (E.D. Pa. Aug. 14, 2020) (quoting *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 494 (1942)).

In *Rarick v. Federated Service Insurance Company*, 852 F.3d 223 (3d Cir. 2017), the Third Circuit established the "independent claim test" as the appropriate test for determining whether a district court should exercise jurisdiction over an action seeking *both* declaratory *and* legal relief based on issues of state law. The *Rarick* Court stated as follows with regard to the independent claim test:

> When a complaint contains claims for both legal and declaratory relief, a district court must determine whether the legal claims are independent of the declaratory claims. If the legal claims are independent, the court has a "virtually unflagging obligation" to hear those claims, subject of course to [*Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800 (1976)'s] exceptional circumstances. If the legal claims are dependent on the declaratory claims, however, the court retains discretion to decline jurisdiction of the entire action, consistent with our decision in [*Reifer v. Westport Ins. Corp.*, 751 F.3d 129 (3d Cir. 2014)].[7]

*Rarick*, 852 F.3d at 229. The Court went on to explain why the independent claim test is superior to other tests it had examined:

> The independent claim test is superior to the others principally because it prevents plaintiffs from evading federal jurisdiction through artful pleading. Although [Plaintiffs] Rarick and Easterday included declaratory claims in their complaints,

---

exercising jurisdiction." *Kelly v. Maxum Specialty Ins. Grp.*, 868 F.3d 274, 281 n.4 (3d Cir. 2017).

[7]    In *Colorado River*, the Supreme Court "reminded federal courts that they have a 'virtually unflagging obligation' to exercise jurisdiction over actions seeking legal relief." *Rarick*, 852 F.3d at 225 (quoting *Colo. River*, 424 U.S. 800, 817 (1976)). However, the Court also explained that abstaining from exercising federal jurisdiction can be justified—and indeed, *only* justified— "in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *Colo. River*, 424 U.S. at 813.

In *Reifer*, the Third Circuit held that "it is not a *per se* abuse of discretion for a court to decline to exercise jurisdiction when pending parallel state proceedings do not exist. Nor is it a *per se* abuse of discretion for a court to exercise jurisdiction when pending parallel state proceedings do exist." *Reifer*, 751 F.3d at 144. Rather, "the existence or non-existence of pending parallel state proceedings is but one factor for a district court to consider." *Id.*

they requested a legal remedy—damages—for breach of contract. Because both cases satisfied the requirements for diversity jurisdiction, Rarick and Easterday could have obtained their desired relief in federal courts without requesting a declaratory judgment. By including a declaratory claim in their pleadings, however, Rarick and Easterday invited the District Court to avoid *Colorado River*'s "virtually unflagging obligation" in favor of the more expansive discretion afforded under *Reifer*.

This outcome is inconsistent with the purpose of the Declaratory Judgment Act, which is to "clarify legal relationships" in order to help putative litigants "make responsible decisions about the future." The Declaratory Judgment Act was intended to "*enlarge*[ ] the range of remedies available in the federal courts" by authorizing them to adjudicate rights and obligations even though no immediate remedy is requested.

*Id.* (citation omitted).

With respect to the first step of the independent claim test—determining the dependency or independency of claims—the Court observes that "[n]on-declaratory claims are 'independent' of a declaratory claim when they are alone sufficient to invoke the court's subject matter jurisdiction and can be adjudicated without the requested declaratory relief." *Rarick*, 852 F.3d at 228 (quoting *R.R. St. & Co., Inc. v. Vulcan Materials Co.*, 569 F.3d 711, 715 (7th Cir. 2009)).

Assuming that Plaintiffs' claim for breach of contract is independent of their claim for declaratory relief, the second step of the independent claim test requires application of *Colorado River*. "The *Colorado River* doctrine allows a federal court to abstain, either by staying or dismissing a pending federal action, when there is a parallel ongoing state court proceeding." *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 307 (3d Cir. 2009). "The initial question is whether there is a parallel state proceeding that raises 'substantially identical claims [and] nearly identical allegations and issues.' If the proceedings are parallel, courts then look to a multi-factor test to determine whether 'extraordinary circumstances' meriting abstention are present." *Id*. at 307-08 (quoting *Yang v. Tsui*, 416 F.3d 199, 204 n.5 (3d Cir. 2005) and *Spring City Corp. v. American Bldgs. Co.*, 193 F.3d 165, 171 (3d Cir. 1999)).

The six factors courts examine to determine whether "exceptional circumstances" exist pursuant to *Colorado River* are the following:  "(1) which court [state or federal] first assumed jurisdiction over property [in an *in rem* case]; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether federal or state law controls; and (6) whether the state court will adequately protect the interests of the parties."[8]  *Spring City Corp.*, 193 F.3d at 171.

### 2.     *Application to Plaintiffs' Complaint*

Applying the "independent claim test" to Plaintiffs' Complaint, the Court first observes that Plaintiffs' claim for breach of contract is indeed independent of their claim for declaratory relief, as it is "alone sufficient to invoke the court's subject matter jurisdiction and can be adjudicated without the requested declaratory relief."  *Rarick*, 852 F.3d at 228; *see Wilson v. Hartford Cas. Co.*, No. CV 20-3384, 2020 WL 5820800, at *5 (E.D. Pa. Sept. 30, 2020) ("This Court has held multiple times that legal claims are independent of claims for declaratory relief when applying *Rarick* to insurance coverage disputes.") (collecting cases).

The Court therefore turns to the second step of the independent claim test—whether the considerations set forth in *Colorado River* and its progeny indicate the existence of "exceptional circumstances" sufficient to negate this Court's "virtually unflagging obligation" to exercise jurisdiction over legal claims.

First, because there is no parallel state court action here, it is doubtful whether *Colorado River* is even applicable.  *See Wilson*, 2020 WL 5820800, at *5 ("Exceptional circumstances do not apply here since there are no parallel pending state court proceedings, which Plaintiffs

---

[8]     "Only the first four of these factors were delineated in *Colorado River*, the other two are drawn from *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 23, 26 (1983)."  *Nationwide Mut. Fire Ins. Co.*, 571 F.3d at 308 n.10.

concede."); *Nat'l City Mortg. Co. v. Stephen*, 647 F.3d 78, 84 (3d Cir. 2011) ("[W]e note that the controversy has taken place almost exclusively in federal court, the state proceeding began after NCM appealed to us and has been stayed pending the outcome of this appeal, and there are none of the complicating factors present in *Colorado River.* Thus, *Colorado River* abstention does not apply either."), *as amended* (Sept. 29, 2011); *Nationwide Mut. Fire Ins. Co.*, 571 F.3d at 307 ("The *Colorado River* doctrine allows a federal court to abstain, either by staying or dismissing a pending federal action, *when there is a parallel ongoing state court proceeding*.") (emphasis added).

However, even if the Court were to consider the *Colorado River* factors, five of the six factors weigh against declining to exercise jurisdiction based on the existence of extraordinary circumstances.  These factors indicate that such extraordinary circumstances do not exist here.

Factor one—which court first assumed jurisdiction over property—is inapplicable here because this is not an *in rem* proceeding.[9]  Factor two—the inconvenience of the federal forum—does not weigh in favor of abstention.  There are no arguments raised that the federal forum is inconvenient for Plaintiffs.  Factor three—the desirability of avoiding piecemeal litigation—is met "only when there is evidence of a strong federal policy that all claims should be tried in the state courts."  *Ryan v. Johnson*, 115 F.3d 193, 197-98 (3d Cir. 1997) (citing *Kentucky West Virginia Gas Co. v. Pennsylvania Public Utility Comm'n,* 791 F.2d 1111, 1118 (3d Cir. 1986)).  There is no evidence of any such strong federal policy here.  Factor four—the order in which jurisdiction was obtained—is inapplicable here because there is no competing state court proceeding, and therefore no "order" of obtaining jurisdiction.  *See Moses H. Cone Mem'l Hosp.*

---

[9]     The Court considers this and the other "inapplicable" factors to be "neutral."  "[T]he presence of a neutral factor necessarily weighs against abstention."  *Hartford Life Ins. Co. v. Rosenfeld*, No. CIV.A. 05-5542, 2007 WL 2226014, at *7 (D.N.J. Aug. 1, 2007).

*v. Mercury Constr. Corp.*, 460 U.S. 1, 21 (1983) (explaining that "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions").  Factor six—whether the state court will adequately protect the interests of the parties—is similarly inapplicable.  *See Ryan*, 115 F.3d at 200 ("[T]he mere fact that the state forum is adequate does not counsel in favor of abstention, given the heavy presumption the Supreme Court has enunciated in favor of exercising federal jurisdiction. Instead, this factor is normally relevant only when the state forum is *in*adequate.") (emphasis in original).

The only factor that weighs in favor of abstention under *Colorado River* is factor five— whether federal or state law controls.  This action is controlled exclusively by Pennsylvania law. The Court also acknowledges that the questions of state law that Plaintiffs' action presents are novel, having yet to be addressed by any Pennsylvania court.[10]  Indeed, as one court in this District recently observed in a similar COVID-related insurance coverage dispute, "[t]he issues of state law presented in Plaintiffs' action are novel, complex, and exceedingly important, creating a compelling public policy interest for these claims to be allowed to be decided by Pennsylvania courts."  *Greg Prosmushkin, P.C. v. Hanover Ins. Grp.*, No. CV 20-2561, 2020 WL 4735498, at *5 (E.D. Pa. Aug. 14, 2020).

However, in the Court's view, the novel nature of the state law question cannot, without more, permit this Court to circumvent its "virtually unflagging obligation" to exercise jurisdiction where the prerequisites for that exercise have otherwise been met, as they have been here.  *See* 28 U.S.C. § 1332.  Nor is this conclusion inconsistent with very recent precedent.  At

---

[10]    The Court's own independent research was unable to unearth any state court decisions addressing the questions at issue in Plaintiffs' suit.

least two courts in this District have recently chosen to exercise jurisdiction over COVID-related

insurance converge disputes where declaratory relief was sought.  In *Wilson v. Hartford Cas.*

*Co.*, No. CV 20-3384, 2020 WL 5820800 (E.D. Pa. Sept. 30, 2020), the court exercised

jurisdiction based on the dependency of plaintiffs' claims for legal and declaratory relief, as well

as on the absence of a parallel state court proceeding, and granted defendants' motion to dismiss

the complaint.  *See id.* at *6 (explaining that "[t]he legal claims found in the Plaintiffs' initial

Complaint appear to be both jurisdictionally and substantively independent (and Plaintiffs do not

argue otherwise) of the requested declaratory relief . . . . As a result, they are alone sufficient to

invoke the Court's subject matter jurisdiction").  Another court in this District recently exercised

jurisdiction in a COVID-related insurance coverage dispute in the absence of a motion to remand

without even engaging in a discussion as to abstention.  *See Brian Handel D.M.D., P.C. v.*

*Allstate Ins. Co.*, No. CV 20-3198, 2020 WL 6545893, at *3 (E.D. Pa. Nov. 6, 2020) (granting

defendant's motion to dismiss and dismissing plaintiff's claims for breach of contract and

declaratory relief where "plaintiff's property remained inhabitable and usable, albeit in limited

ways" and finding that "[p]laintiff has failed to plead plausible facts that COVID-19 caused

damage or loss in any physical way to the property so as to trigger coverage").

It is moreover significant that in several recent COVID-based insurance disputes in which

federal courts in this Circuit have *declined* to exercise jurisdiction, unlike Plaintiffs' Complaint

here the complaints at issue presented *only* a request for declaratory judgment and no claims for

legal relief.  *See, e.g., Greg Prosmushkin, P.C.*, No. CV 20-2561, 2020 WL 4735498, at *5 (E.D.

Pa. Aug. 14, 2020) ("In sum, Plaintiffs present no independent claim for legal relief in their

Complaint."); *Dianoia's Eatery, LLC v. Motorists Mut. Ins. Co.*, No. CV 20-787, 2020 WL

5051459, at *2 (W.D. Pa. Aug. 27, 2020) ("Plaintiff's single-count declaratory judgment action

simply does not state a breach of contract action against Defendant seeking damages."); *Venezie Sporting Goods, LLC v. Allied Ins. Co. of Am.*, No. 2:20-CV-1066, 2020 WL 5651598, at *3 (W.D. Pa. Sept. 23, 2020) ("The long and the very short of it is that there are no independent money damage or equitable claims asserted, only a request that this Court implement a declaration of coverage by either requiring Defendants to act in accord with such a declaration, or to refrain from taking actions contrary to such a declaration.").  The absence of independent legal claims allowed these courts to retain "the more expansive discretion afforded under *Reifer*" to decline the exercise of jurisdiction.  *Rarick v. Federated Serv. Ins. Co.*, 852 F.3d 223, 229 (3d Cir. 2017).

In summary, the circumstances capable of constituting "exceptional circumstances" as set forth in *Colorado River* and its progeny are "extraordinary and narrow exception[s]" to a federal court's "virtually unflagging obligation" to exercise jurisdiction where legal relief is sought. *Colo. River*, 424 U.S. at 813, 817.  The Court acknowledges that Plaintiffs' Complaint presents novel questions of Pennsylvania law.  However, in light of (1) the independence of Plaintiffs' legal claim from their request for declaratory relief, and (2) the absence of any parallel state court proceedings, the Court finds that there are insufficient other considerations to permit the Court to circumvent this obligation.  The Court will therefore exercise its jurisdiction, and proceeds to an analysis of Cincinnati's motion to dismiss Plaintiffs' Complaint.

### B.    Cincinnati's Motion to Dismiss the Complaint

#### 1.    *Legal Standard:  Motions to Dismiss under Rule 12(b)(6)*

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court clarified the appropriate pleading standard in civil cases and set forth the approach to be used when deciding motions to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

After identifying a pleaded claim's necessary elements,[11] district courts are to "identify [

] pleadings that, because they are no more than conclusions, are not entitled to the assumption of

truth."  *Id*. at 679; *see id*. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic

recitation of the elements of a cause of action will not do.'" (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007))); *Thourot v. Monroe Career & Tech. Inst*., No. CV 3:14-1779, 2016

WL 6082238, at *2 (M.D. Pa. Oct. 17, 2016) (explaining that "[a] formulaic recitation of the

elements of a cause of action" alone will not survive a motion to dismiss).  Though "legal

conclusions can provide the framework of a complaint, they must be supported by factual

allegations."  *Iqbal*, 556 U.S. at 679.

Next, if a complaint contains "well-pleaded factual allegations, a court should assume

their veracity and then determine whether they plausibly give rise to an entitlement to relief."

*Iqbal*, 556 U.S. at 679.  "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Id*. at 678.  This standard, commonly referred to as the "plausibility

standard," "is not comparable to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully."  *Id*. (citing *Twombly*, 550 U.S. at 556-57).  It

is only where the "[f]actual allegations . . . raise a right to relief above the speculative level" that

---

[11]      The Third Circuit has identified this approach as a three-step process, with the
identification of a claim's necessary elements as the first step.  *See Connelly v. Lane Const.
Corp.*, 809 F.3d 780, 787 n.4 (3d Cir. 2016) ("Although *Ashcroft v. Iqbal* described the process
as a 'two-pronged approach,' 556 U.S. 662, 679 (2009), the Supreme Court noted the elements
of the pertinent claim before proceeding with that approach, *id.* at 675-79.  Thus, we have
described the process as a three-step approach.") (citation omitted).

the plaintiff has stated a plausible claim.[12]  *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d

Cir. 2008) (quoting *Twombly*, 550 U.S. at 555).

Putting these steps together, the Court's task in deciding a motion to dismiss for failure to

state a claim is to determine the following:  whether, based upon the facts as alleged, which are

taken as true, and disregarding legal contentions and conclusory assertions, the complaint states a

claim for relief that is plausible on its face in light of the claim's necessary elements.  *Iqbal*, 556

U.S. at 679; *Ashford v. Francisco*, No. 1:19-CV-1365, 2019 WL 4318818, at *2 (M.D. Pa. Sept.

12, 2019) ("To avoid dismissal under Rule 12(b)(6), a civil complaint must set out sufficient

factual matter to show that its claims are facially plausible."); *see Connelly*, 809 F.3d at 787.

In adjudicating a Rule 12(b)(6) motion, the scope of what a court may consider is

necessarily constrained:  a court may "consider only the complaint, exhibits attached to the

complaint, matters of public record, as well as undisputedly authentic documents if the

complainant's claims are based upon these documents."  *United States v. Gertsman*, No. 15

8215, 2016 WL 4154916, at *3 (D.N.J. Aug. 4, 2016) (quoting *Guidotti v. Legal Helpers Debt

Resolution*, L.L.C., 716 F.3d 764, 772 (3d Cir. 2013)).  A court adjudicating a Rule 12(b)(6)

motion may also take judicial notice of certain undisputed facts.  *See Devon Drive Lionville, LP

v. Parke Bancorp, Inc*., No. CV 15-3435, 2017 WL 5668053, at *9 (E.D. Pa. Nov. 27, 2017).

### 2.    *Applicable Legal Principles:  Insurance Policies as Contracts*

A dispute over coverage arising under an insurance policy "is fundamentally an issue of

contract interpretation."  *Wilson*, 2020 WL 5820800, at *6.  As both sides here appear to assume,

---

[12]    As the Supreme Court has observed, "[d]etermining whether a complaint states a
plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw
on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679

Pennsylvania's law of contracts and rules of contract interpretation govern the instant dispute.[13]

Under Pennsylvania law,

> [c]ontract interpretation is a question of law that requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement. Courts assume that a contract's language is chosen carefully and that the parties are mindful of the meaning of the language used. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.

*In re Old Summit Mfg., LLC*, 523 F.3d 134, 137 (3d Cir. 2008) (quoting *Dep't of Transp. v. Pa. Indus. for the Blind & Handicapped,* 886 A.2d 706, 711 (Pa Cmwlth. Ct. 2005)).

In construing an insurance policy to determine whether coverage was improperly denied, the Court must first determine whether a policy's language is unambiguous, or whether it is reasonably susceptible to different readings. "When policy language is clear and unambiguous, a court applying Pennsylvania law must give effect to that language." *Toppers Salon & Health Spa, Inc. v. Travelers Property Casualty Co. of America*, No. 2:20-CV-03342, 2020 WL 7024287, at *2 (E.D. Pa. Nov. 30, 2020) (citing *Kvaerner Metals Div. of Kvaerner, U.S. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006)). "When a provision in a policy is ambiguous, however, the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage." *401 Fourth St., Inc. v. Inv'rs Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005). A policy's language is ambiguous "if it is reasonably susceptible of different constructions and

---

[13]      "In a diversity case, the forum state's choice of law rules govern. Under Pennsylvania's choice of law rules, a contract is construed according to the law of the state with the 'most significant contacts or relationship with the contract.'" *Wilson*, 2020 WL 5820800, at *6 n.3 (citing *Gen. Star Nat. Ins. Co. v. Liberty Mut. Ins. Co*., 960 F.2d 377, 379 (3d Cir. 1992) and quoting *Hammersmith v. TIG Ins. Co*., 480 F.3d 220, 228 (3d Cir. 2007)).  Because the Policies here were issued to insure businesses and property located in Pennsylvania, the Court can safely assume the law of Pennsylvania governs interpretation of the Policies.  The parties appear to assume the same.  *See* Defs.' Mem. at 13; Plaintiffs' Memorandum in Opposition ("Pls.' Opp'n."), ECF No. 11, at 4, 6.

capable of being understood in more than one sense." *Id.* (quoting *Madison Construction Co. v. Harleysville Mutual Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999)).

Under Pennsylvania law, "[t]he initial burden in insurance coverage disputes is on the insured to show that the claim falls within the policy." *Brian Handel D.M.D., P.C. v. Allstate Ins. Co.*, No. CV 20-3198, 2020 WL 6545893, at *2 (E.D. Pa. Nov. 6, 2020). "[I]f the insured meets that burden, the insurer then bears the burden of demonstrating that a policy exclusion excuses the insurer from providing coverage if the insurer contends that it does." *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009) (citing *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996)).

### 3.     *The Contentions of the Parties*

According to Cincinnati, "[t]he requirement of direct physical loss is a core element in property insurance policies like Plaintiffs', and appears in multiple places in the [P]olicies." Defs.' Mem. at 6. Pointing to the Policies' definition of "loss" as "physical loss or damage to property," Cincinnati contends that "there is no Covered Cause of Loss, and therefore no Business Income coverage, unless the insured first establishes, among other things, that there is direct physical loss to covered property." *Id.* According to Cincinnati, because "Plaintiffs not only *admit*, but *affirmatively allege*, that there was no direct physical loss or damage to any property as a result of the virus, or the [Governor's] Orders," there can be no coverage under the Policies. *Id.* at 12 (emphasis in original) (citing Compl. ¶ 52 ("A virus, unlike a fire, flood, or weather event, cannot damage walls, floors, roofs or equipment.")). In support of this contention, Cincinnati points to *Philadelphia Parking Authority v. Fed. Ins. Co.*, 385 F. Supp. 2d 280 (S.D.N.Y. 2005), a case applying Pennsylvania law, and argues that *Philadelphia Parking Authority* is consistent with a growing body of case law holding that virus-related losses do not

constitute physical damage or loss.  *See* Defs.' Mem. at 13-20.  Cincinnati also argues that the absence of a virus exclusion in the Policies is irrelevant, because "[e]xclusions do not come into play unless there is first direct physical loss," which there is not.  *Id*. at 20.  Finally, Cincinnati asserts that there is no Civil Authority coverage, because the "Plaintiffs do not allege the [Governor's] Orders prohibited access to their premises," as the Policies require.  *Id*. at 23.

In opposition, Plaintiffs first contend that they are entitled to business interruption coverage under the Policies because "loss" is defined as *either* "physical loss" *or* "physical damage," and while their properties have not been damaged, they have sustained "physical loss."[14]  Pls.' Opp'n. at 3-4.  In particular, Plaintiffs claim "physical loss" is synonymous with "loss of <u>use</u> of the property," which they have suffered as a result of the pandemic and the Governor's Orders.  *Id*. at 7 (emphasis in original).  Accordingly, they need not have sustained "physical damage" to their premises.  *See id*. at 7-8.  *See id*. at 4-7.

According to Plaintiffs, they are also entitled to coverage under the "Civil Authority" provision of the Policies.  *See* Pls.' Opp'n. at 8-11.  The heart of their argument on this point is as follows:

> As a result of the Civil Authority Orders, access to Plaintiffs' properties was strictly prohibited. The principal use of the properties was for upscale on-site dining. These were not drive-through pickup fast food places. Defendants' contention that because Plaintiffs could continue take out and home delivery service, there was no denial of access misses the point that there has been physical loss or damage when the use of the property has been "nearly eliminated."

*Id*. at 10.

---

[14]    In further support of this argument, Plaintiffs make a single, conclusory contention as to the absence of a virus exclusion:   "At the outset, we note that there is no contention by Defendants that there is a virus exclusion in the policy, so COVID-19 is a covered cause of loss."  Pls.' Opp'n. at 3.

**4.     *Application to Plaintiffs' Complaint***

The Court finds that Plaintiffs are not entitled to coverage under the Policies, because their premises have not suffered a direct "loss" as that term is unambiguously defined in the Policies:  "[a]ccidental *physical* loss or accidental *physical* damage."  Policy at 67 (emphasis added).  As an initial matter, it appears that Plaintiffs concede that their premises have not suffered any direct "physical damage" as a result of COVID-19 and the Governor's Orders.  *See* Pls.' Opp'n. at 7 ("For there to be coverage for business interruption lost income there must be direct physical loss to the insured properties. Direct physical damage is not required.").  The Court will therefore focus its analysis on the construction of the term direct "physical loss."

In light of the plain language of the Policies—in particular, the modifier "physical" preceding the word "loss"—and after surveying the legal authority presented by the parties and revealed through the Court's own independent research, the Court reaches the following conclusion:  To constitute direct "physical loss" under the Policies as that term is construed under Pennsylvania law, economic loss resulting from an inability to utilize a premises as intended must (1) bear some causal connection to the *physical* conditions of that premises, which conditions (2) operate to completely or near completely preclude operation of the premises as intended.[15]  The Court finds support for these conclusions in relevant case law.

In *Port Authority of New York and New Jersey v. Affiliated FM Ins. Co*., 311 F.3d 226 (3d Cir. 2002), the Third Circuit, applying New York and New Jersey state law, addressed the question of to what extent the presence of asbestos in a building constitutes "physical loss or

---

[15]     To frame point (1) slightly differently, although the Court agrees with Plaintiffs that the disjunctive nature of "physical loss" *or* "physical damage" as used in the Policies indicates that the two terms are not synonymous, *see* Pls.' Opp'n. at 4, the Court disagrees that "physical loss" is synonymous with "loss of <u>use</u> of [ ] property," *id*. at 7, alone—that is, loss having not arisen as a result of a tangible physical condition of or on the premises.

damage" so as to warrant coverage under an "All Risk" property insurance policy similar to the

Policies at issue here.  Affirming a grant of summary judgment in favor of the insurer, the Court

stated as follows with regard to the term "physical loss":

> When the presence of large quantities of asbestos in the air of a building is such as to make the structure uninhabitable and unusable, then there has been a distinct loss to its owner. However, if asbestos is present in components of a structure, but is not in such form or quantity as to make the building unusable, the owner has not suffered a loss. The structure continues to function—it has not lost its utility. The fact that the owner may choose to seal the asbestos or replace it with some other substance as part of routine maintenance does not bring the expense within first-party coverage.. . . The effect of asbestos fibers in such quantity is comparable to that of fire, water or smoke on a structure's use and function.

*Id*. at 236.  *Port Authority*'s central holding—that a release of asbestos fibers, or an imminent

threat of such a release, must have "resulted in contamination of [ ] property such that its

function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable,"

*id*.—was upheld under Pennsylvania law by the Third Circuit in *Motorists Mut. Ins. Co. v.

Hardinger*, 131 F. App'x 823 (3d Cir. 2005), an unpublished opinion.[16]  *See id*. at 826 ("We

predict that the Pennsylvania Supreme Court would adopt a similar principle as we did in *Port

Authority*.").

In *Philadelphia Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280 (S.D.N.Y. 2005), the

Southern District of New York, applying Pennsylvania law, addressed whether economic loss on

---

[16]    *Hardinger* involved contamination of a homeowner's well from e-coli bacteria.  In *Hardinger*, the Third Circuit found instructive a 1992 Pennsylvania trial court decision in *Hetrick v. Valley Mut. Ins. Co.*, 15 Pa. D. & C 4th 271 (Pa. Com. Pl. 1992).  The Court noted that "[i]n *Hetrick,* the court gave substantial attention and approval to *Western Fire Insurance Co. v. First Presbyterian Church*, 165 Colo. 34, 38-39, 437 P.2d 52(1968). In that case, the Colorado Supreme Court held the term 'direct physical loss' extended to cover the loss of use of the insured property where the accumulation of gasoline around and under the property rendered it uninhabitable."  *Hardinger*, 131 F. App'x at 826 n.4.  The court in *Hetrick* (the 1992 trial court decision) concluded as follows:  "an oil spill which pollutes the ground water may make a building uninhabitable. And if the building is uninhabitable, then there is direct loss to that building."  *Hetrick*, 15 Pa. D. & C.4th at 274 (internal citation omitted).

its own could warrant coverage under a policy's "direct physical loss" provision.   There, the

operator of a parking garage at the Philadelphia International Airport sustained significant

economic loss as the result of a downturn in air travel stemming from the terrorist attacks of

September 11, 2001.  The court held that economic loss stemming from an inability to utilize

property as intended was alone not sufficient to invoke coverage:

> The Court finds that the phrase "physical loss or damage" is not ambiguous since "reasonably intelligent [people] on considering it in the context of the entire policy would [not] honestly differ as to its meaning." As stated above, the phrase "direct physical loss or damage," when considered in the context of the Insurance Policy at issue in the present case, requires *that claimed loss or damage must be physical in nature.*

*Id.* at 289 (emphasis added) (quoting *United Servs. Auto Ass'n v. Elitzky*, 517 A.2d 982, 985 (Pa.

Super. Ct. 1986)).  The Southern District of New York also held that the at-issue policy's "civil

authority" provision did not cover plaintiff's economic losses, as the relevant civil authority "did

not 'prohibit[ ] access to' Plaintiff's garages as the policy requires."  *Philadelphia Parking Auth.*,

385 F. Supp. 2d at 289.

At least two recent cases from within the Eastern District of Pennsylvania have reached

These cases support the conclusion that under Pennsylvania law, for Plaintiffs to assert an

economic loss resulting from their inability to operate their premises as intended within the

coverage of the Policy's "physical loss" provision, the loss and the bar to operation from which it

results must bear a causal relationship to some *physical condition* of or on the premises.  The

cases also indicate the existence of an element correlating to extent of operational utility—*i.e.*, a

premises must be uninhabitable and unusable, or nearly as such; the ability to operate in almost

any capacity, even on a limited basis, precludes coverage.

At least two recent cases from within the Eastern District of Pennsylvania have reached

the same conclusions when construing similar contracts in light of COVID-19.

In a November 6, 2020 decision *in Brian Handel D.M.D., P.C. v. Allstate Ins. Co.*, No. CV 20-3198, 2020 WL 6545893 (E.D. Pa. Nov. 6, 2020), the court held that economic losses resulting from COVID-19 and the Governor's Orders suffered by a dentist's office did not constitute "direct physical loss" under a property insurance  policy.  Because "no order by either the Governor or the Department of Health ever required dental offices such as plaintiff to close completely" and because "plaintiff was able to remain open for emergency procedures," the court concluded that "plaintiff's property remained inhabitable and usable, albeit in limited ways. Plaintiff has failed to plead plausible facts that COVID-19 caused damage or loss in any physical way to the property so as to trigger coverage." *Id*. at *3.

The court reached a similar conclusion in a November 30, 2020 decision in *Toppers Salon & Health Spa, Inc. v. Travelers Property Casualty Co. of America*, No. 2:20-CV-03342, 2020 WL 7024287 (E.D. Pa. Nov. 30, 2020).  In that case, the owner of a spa brought suit under an insurance policy for lost revenue resulting from COVID-19 and the Governor's shut-down Orders, claiming coverage under a "direct physical loss of or damage to" provision.  Unlike the dentist office in *Handel*, plaintiff in *Toppers* was required to suspend its operations.  So the only question before the court was "whether physical loss or damage caused that suspension." *Id*. at *3.  The court found that "[i]t did not," because the policy's other provisions—in particular, reference to a "period of restoration," and the premises being "repaired, rebuilt or replaced"— made "clear that there must be some sort of physical damage to the property that can be the subject of a repair, rebuilding, or replacement. The Covid-19 pandemic does not fall within that definition." *Id*. at *4.

Here, Plaintiffs' loss of business income as a result of COVID-19 and the Governor's Orders does not constitute direct "physical loss" under the Policies for the same reasons coverage

was precluded in *Handel* and *Toppers*.  First, there is no physical component to Plaintiffs' loss; there are no allegations that any physical conditions of or on the covered premises have been altered in a way that has resulted in or affected Plaintiffs' loss.[17]  Second, Plaintiffs maintain the ability to operate at their premises, albeit on a limited basis.  For these related reasons, Plaintiffs have suffered no direct "physical loss."  Without a direct "physical loss" or direct "physical damage," there is no "Covered Cause of Loss."  Under these circumstances, Plaintiffs cannot claim coverage under the "Business Income" provision of the Policies.

Finally, for the reasons that have already been presented, there is also no coverage under either the Policies' "Extra Expenses" or "Civil Authority" provisions.  *See* Policy at 48.  Coverage under both provisions requires an insured to have suffered a Covered Cause of Loss, and thus a direct physical loss.  *See id.*  With no direct physical loss, there can be no coverage.  Additionally, it is clear that Plaintiffs' ability to continue limited takeout and delivery operations at the premises precludes coverage under the Civil Authority provision:  a prohibition on access to the premises, which is a prerequisite to coverage, is not present.[18]  *See Handel*, 2020 WL 6545893, at *3 ("[P]laintiff's property remained inhabitable and usable, albeit in limited ways.

---

[17]     Construing "physical loss" under the Policies to require a causal connection to some physical condition of a covered premises is, similar to the policy in *Toppers*, further supported by the structure of the Policies.  As Cincinnati points out, here "there can be no 'Period of Restoration'" for pandemic-related losses as that term is used in the Policies, *see* Policy at 47-48, "because the Coronavirus does not constitute direct physical loss to property requiring any physical repair, rebuilding or replacement. The inapplicability of the 'Period of Restoration' element to Plaintiffs' alleged loss further demonstrates that . . . pure economic losses are not covered under the Policy," Cincinnati's Reply Memorandum ("Defs.' Mem."), ECF No. 13, at 5.

[18]     Additionally, Plaintiffs' conclusory assertion that, because "there is no contention by Defendants that there is a virus exclusion in the policy," it follows that "COVID-19 is a covered cause of loss," Pls.' Opp'n. at 3, is without merit.  It is undisputed that there is no virus exclusion.  However, Plaintiffs have failed to provide any support for the notion that the absence of an exclusion means that whatever could have been excluded but wasn't is necessarily covered.  Even more fundamentally, the issue of exclusions is irrelevant as Plaintiffs' claims do not fall within the scope of the Policies' coverage.

Plaintiff has failed to plead plausible facts that COVID-19 caused damage or loss in any physical way to the property so as to trigger coverage.").

> ### C.    Leave to Amend

The Court must consider whether Plaintiffs are entitled to amend the Complaint and re-plead their claims.  *See Kanter v. Barella*, 489 F.3d 170, 181 (3d Cir. 2007) ("Generally, a plaintiff will be given the opportunity to amend her complaint when there is an asserted defense of failure to state a claim.").  Although leave to amend pleadings, when not as of right, should be "freely give[n] when justice so requires," FED. R. CIV. P 15(a)(2), the denial of leave to amend is appropriate where there exists undue delay, bad faith, dilatory motive, or futility.  *See Holst v. Oxman*, 290 F. App'x 508, 510 (3d Cir. 2008).

Here, it is clear that any amendment to the Complaint would be futile.  The terms of the Policies are not in dispute, and there is nothing else Plaintiffs could allege that would bring their claimed losses within the Policies' coverage.  Leave to amend is therefore denied.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs are not entitled to coverage under the terms of the Policies for their COVID-related business income losses.  As such, their Complaint fails to state a viable claim for relief, and it is dismissed, with prejudice.

A separate Order follows this Opinion.

BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*_____
JOSEPH F. LEESON, JR.
United States District Judge